# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VERNELL DANTZLER, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ACTS RETIREMENT | : | |
| LIFE COMMUNITIES, INC., | : | No. 16-1961 |
| Defendant. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                                                               **August 23, 2017**

ACTS Retirement Life Communities, Inc. ("ACTS") fired Vernell Dantzler following an altercation between Dantzler and a co-worker. Dantzler sued her former employer, ACTS Retirement Life Communities, alleging that she was fired because of her age and her religion. ACTS has filed a motion for summary judgment. Additionally, ACTS has filed a motion for sanctions, arguing that Dantzler's claims are frivolous. As the record does not support Dantzler's legal claims, the Court will grant the motion for summary judgment. However, the Court will deny the motion for sanctions.

## I.  FACTUAL BACKGROUND[1]

Dantzler is a 54-year old woman and a practicing Muslim. (Def.'s Statement of Undisputed Material Facts in Supp. of Its Mot. for Summ. J. [Def.'s Undisputed Facts] ¶ 4.) Dantzler has been a practicing Muslim since 1994. (Def.'s Mot. for Summ. J. Ex. A [Dantzler Dep.] at 7–8.) Dantzler was one of several Muslims who worked at ACTS's Spring House Estates facility, where she worked

---

[1] ACTS correctly notes that Plaintiff's counsel failed to follow this Court's procedure for responding to summary judgment motions. Moreover, Plaintiff's counsel filed three responses, filed the responses on different days, and filed the responses late. This Court trusts that this conduct will not occur in the future.

with dementia patients. (Def.'s Undisputed Facts ¶¶ 6–7, 11.) She began working as a certified nurse assistant at ACTS in 1994, and later became a restorative aide. (*Id*. ¶ 5.) As a certified nurse assistant, Dantzler would, among other duties, bathe, feed, and put patients to bed. (Dantzler Dep. at 11). As a restorative aide, she was responsible for helping patients walk and assisting them with feeding. (*Id*. at 15.)

In 2013 and 2014, Maureen Stanton, the Director of Nursing, supervised Dantzler. (Def.'s Undisputed Facts ¶ 16.) Maureen Vigna, the Assistant Director of Nursing, also supervised Dantzler, as well as conducted Dantzler's annual performance evaluations. (*Id*. ¶ 17.) Donna Thompson, the Administrator, was Stanton and Vigna's boss prior to 2013. (*Id*. ¶ 18.) Holly Slade was the Director of Spring House Estates until her promotion in mid-2013. (*Id*. ¶ 19.) Thompson was promoted to Slade's job after Slade was promoted. (*Id*. ¶ 20.) Thompson was the Director at the time that Dantzler was fired. (*Id*. ¶ 23.) When ACTS promoted Thompson to Director, Brian Levesque became the Administrator at Spring House Estates. (*Id*. ¶ 21.)

According to Dantzler, the troubles began after Levesque's promotion. (*See* Dantzler Dep. at 67 ("I never felt that I was harassed the whole 19 years I was there until Brian came.").) During her deposition, Dantzler reported three incidents involving Levesque that led her to believe that he was harassing her. First, shortly after Dantzler's father died, she tried to bring some pastries from the funeral to work so that the baked goods would not go to waste. (*Id*. at 68.) Levesque scolded Dantzler for pulling up to the building and not clocking in. (*Id*. at 70–71.) The second incident occurred when Dantzler was giving a resident a bath. The resident had a rolling walker with a seat, and after the bath, Dantzler pushed the resident, seated, on the rolling chair, to his room. (*Id*. at 73–74.) Levesque saw this and told Dantzler that she could not push the resident to his room. (*Id*.

2

at 74–75.) She continued to push the resident. (*Id*. at 74–75.) Dantzler was not formally disciplined for her conduct, but Levesque reiterated that he did not want Dantzler pushing the resident in the rolling walker. (*Id*. at 76.) Additionally, Vigna required the nurses to sign a paper and acknowledge that residents should not be pushed in rolling chairs. (*Id*. at 79.) The third incident of harassment to which Dantzler testified was requiring her to clock out if she left the building to pray. (*Id*. at 81–84.)

The incident that led to Dantzler's firing occurred on June 4, 2014, when co-worker Alicia Hollinger entered the break room where Dantzler was doing paperwork. (*Id*. at 113.) Dantzler greeted Hollinger and asked her if she had money for a birthday club that some of the ACTS employees participated in. (*Id*.) Hollinger responded that she did not have the money. (*Id*. at 115.) Dantzler next saw Hollinger in the dining room and said, "Alicia, you know, what's the problem? You got your money like?" (*Id*. at 120.) Hollinger retorted, "Didn't the fuck I say I don't have my money?" (*Id*.) The two continued jawing at each other in the dining room. (*Id*. at 120–21.) Dantzler then proceeded to Vigna's office, and Hollinger followed. (*Id*. at 121.) Dantzler reported to Vigna that she and Hollinger had a heated verbal altercation, and Vigna went to get Levesque. (*Id*. at 121–22.) Rather than stay in Vigna's office as directed, however, the two women followed Vigna into Levesque's office and continued to call each other names and curse at each other. (*Id*. at 122.) Dantzler told Hollinger to "[m]eet me outside . . . We can just do whatever we've got to do outside." (*Id*. at 123.) Both Dantzler and Hollinger were suspended and sent home.

Dantzler testified that Levesque informed her that human resources had decided to fire her. (*Id*. at 124.) Hollinger was also fired. (*Id*.) Dantzler testified that her last day of work at ACTS was June 14, 2014, although an ACTS memo signed by Levesque and Vigna states that Dantzler and Hollinger were fired over the telephone on June 5, 2014 (Dantzler Dep. at 23; Def.'s Mot. for Summ.

3

J. Ex. D [Memo].)

ACTS had a "zero tolerance policy" regarding workplace violence: "Any employee who engages in any threatening behavior or acts of violence; who uses any obscene, abusive, or threatening language or gestures will be subject to progressive discipline up to and including termination." (*Id*. ¶ 31.)

ACTS fired Dantzler and Hollinger for violations of the workplace violence policy. (Def.'s Undisputed Facts ¶ 71.) ACTS replaced Dantzler with Hyacinth Wedderburn, a non-Muslim who is older than Dantzler. (*Id*. ¶¶ 77–78.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing*

*Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

### A. Age Discrimination

At this point, it is unclear if Dantzler is proceeding on this claim. Plaintiff's response fails to mention this claim and she puts forth no evidence in support of this claim. At any rate, ACTS is entitled to summary judgment on the age discrimination claim.

Dantzler's age discrimination case will be analyzed using the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff has the burden of establishing a prima facie case of age discrimination. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). Only if she does establish a prima facie case, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the alleged adverse employment action. *Id*. If the defendant meets its burden, the plaintiff must show that the defendant's proffered legitimate, nondiscriminatory reason was pretextual. *Id*.

To establish a prima facie case of age discrimination under the ADEA, the plaintiff must show four factors: (1) she is over forty, (2) she is qualified for the position in question, (3) she suffered from an adverse employment decision, and (4) her replacement was sufficiently younger to permit a reasonable inference of age discrimination. *Ptasznik v. Univ. of Pa.*, 523 F. App'x 156, 159 (3d Cir. 2013).

Dantzler's claim fails because she cannot make out a prima facie case for age discrimination. The evidence is undisputed that Dantzler was replaced by a woman older than she. Plaintiff has

presented no evidence that suggests age was the reason for her termination.

When asked for the basis of her age discrimination claim, Dantzler said, "I'm 50 years old. They can bring somebody in and pay them less money than they're giving me. When I started there, I was making $6.75. When I left, I was making close to $17.00." (Dantzler Dep. at 134.) She continued, "they can bring somebody in younger, less money, and start them all over and they won't even have to be – and then I was getting ready to get my bonus for 20 years. I didn't get that because that was the next month I was getting that." (*Id.*)

Of course, there is some economic truth to Dantzler's statement. More experienced workers often garner higher wages and with age comes experience. Regardless, Dantzler failed to produce evidence to make out a prima facie case; her age discrimination claim must therefore be dismissed. Even if ACTS sought less expensive workers—a proposition that Dantzler did not pursue—Dantzler was replaced by a woman older than she. (*Id.* at 135–36.)

Dantzler also testified that she believed in her heart that age was the reason that she was fired. (*Id.* at 146–47.) She also testified that her brother, who works for the Pennsylvania Human Relations Commission, told her that she was discriminated against. (*Id.* at 147.)

Dantzler's feeling that age led to her firing and her brother's say-so, are not acceptable substitutes for evidence in the record of age discrimination. The Court will therefore grant ACTS's summary judgment motion on this claim.

**B.     Religious discrimination**

   *1.     Fired on the basis of religion*

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

Dantzler's disparate treatment claim of religious discrimination is also analyzed under the *McDonnell Douglass* framework. The first step, the prima facie case, is similar to test used for age discrimination. Dantzler must establish: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

Dantzler has failed to make out a prima facie case because there is no evidence in the record that demonstrates she was fired because of her religion. Plaintiff's response refers to "similar situations" that occurred with other individuals, including Hollinger, in which neither party was fired. (Pl.'s Opp'n to Mot. for Summ. J. at 1.) Dantzler claims that she was fired after a single incident over an otherwise-exemplary twenty-year career. Hollinger, on the other hand, had multiple incidents prior to termination (*Id*. at 2.) Plaintiff directs the Court to her interrogatory responses, which includes the names of witnesses who "will testify to Alicia Hollinger receiving multiple chances with similar incidents." (*Id*. at 3.) Dantzler also noted that she requested personnel files, but Defendant refused to provide the files. (*Id*.)

This information, which is actually just a list of people who may have information helpful to Dantzler, is insufficient to defeat a motion for summary judgment. Dantzler has provided no information about these altercations involving Hollinger. The Court cannot simply infer that Hollinger is similarly situated or that she was involved in altercations similar to the June 4, 2014 incident. It is unclear what information these individuals can offer because the record contains no

7

testimony, no documents, and no affidavits from any of these people. Indeed Dantzler's interrogatory responses notes that "Each witness has not been prepped and interview [*sic*] to date. Plaintiff reserves the right to supplement its response to this request." It appears as though Dantzler wants to skip summary judgment and establish her religious discrimination claim based on what she believes certain individuals will testify to at trial. The dictates of Rule 56 are not so easy to skirt. Rather, Dantzler "must point to concrete evidence in the record that supports each and every essential element of [her] case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 2010); *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

ACTS does not dispute that Dantzler was a good employee. And perhaps Hollinger was a problem employee. But this Court does not sit in judgment of ACTS's business decisions. *See Andersen v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 741 (E.D. Pa. 2015) (noting that it is not the job of the court to decide whether the employer made a wise business decision in firing an employee, but rather whether the real reason for the decision was discrimination). And without evidence in the record to support Dantzler's contention that Hollinger was treated differently, the Court must grant summary judgment to ACTS on Dantzler's claim that she was fired because of her religion.

### 2. *Failure to accommodate*

In addition to Dantzler's claim that she was fired because she is a Muslim, she also argues that ACTS failed to accommodate the practice of her religion. Specifically, ACTS did not allow her to pray when necessary.

An employer may not make an applicant's religious practice, confirmed or otherwise, a factor

8

in employment decisions. *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015). To establish a prima facie failure to accommodate claim, an employee must demonstrate that: (1) she holds a sincere religious belief that conflicts with a job requirement; (2) she informed her employer of the conflict; and (3) she was disciplined for failing to comply with the conflicting requirement. *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010). If the plaintiff makes out a prima facie case, the burden shifts to the employer to show either: (1) it made a good-faith effort to reasonably accommodate the religious belief or (2) such an accommodation would cause an undue hardship on the employer and its business. *Id.*

Dantzler claims that before Levesque became the administrator, she was freely permitted to pray. She states in her interrogatory response, "[t]here was never a need for accommodations because they were already accommodating. From the beginning I never had a problem until the new administrator was hired." Additionally, in Dantzler's interrogatory response, she states that Levesque "did not allow me to pray. I would pray in my car and he would not allow me to go to my car."

Dantzler deposition testimony regarding her ability to pray is different than her interrogatory response on the matter. According to Dantzler, she prayed approximately five times a day. (Dantzler Dep. at 82.) Prior to Levesque becoming the Administrator, if she needed to pray at work, she would go to her car for about three minutes, pray, and then return to her job. (*Id.* at 83.) Dantzler testified that after Levesque became the Administrator, he mentioned something to her about going to her car to pray; he told her that she could not leave the building without clocking out. (*Id.* at 83–84.) In response to Levesque's command, Dantzler said, "okay, no problem," because she was required to follow the Administrator's directives. (*Id.* at 91.)

Dantzler has failed to establish the third prong of her prima facie case for failure to

accommodate. There is nothing in the record indicating that Dantzler suffered an adverse employment consequence as a result of her need to pray throughout the day. The most that can be reported is that Dantzler had to clock out before she left the building to pray. The only additional testimony is that she agreed to clock out. There is no evidence that she was barred from praying during working hours. There is no testimony that addressed whether she actually clocked out on any occasion and there is no evidence that her need to pray was in any way related to her firing. Dantzler agreed to clock out prior to leaving the building and she pointed to no time during her employment in which she was barred from leaving the building to pray. And she testified that Levesque "never told me I couldn't pray because I wouldn't allow him to tell me I couldn't pray." (Dantzler Dep. at 148.) Therefore, there is no conflict here with Dantzler's religious needs and her employer's job requirements; such a conflict is a necessary element for a religious accommodation charge. *See Stone v. West*, 133 F. Supp. 2d 972, 985–86 (E.D. Mich. 2001) (granting summary judgment on religious accommodation claim because the plaintiff agreed to work on the sabbath); *see also Isse v. Am. Univ.*, 540 F. Supp. 2d 9, 29 (D.D.C. 2008) ("Plaintiff does not allege that he chose to attend Friday prayers in lieu of driving an assigned route, and therefore cannot—and does not—show that he was either disciplined or threatened with discipline as a result of the conflict between his religious belief and his employment requirements."). Dantzler's failure to accommodate claim must be dismissed.

  **C.**  **Motion for Sanctions**

  The Court will quickly dispose of Defendant's motion for Rule 11 sanctions, which the Court was surprised—and a bit disappointed—to see filed. First, it appears as though Dantzler has abandoned her age discrimination claim. That could have been done more explicitly; the Court is not certain that Dantzler has proceeded with this claim and analyzed it only for the sake of completeness.

However, the proper course of action here is to grant the summary judgment motion, not to award harsh sanctions for a claim that, for all intents and purposes, appears to have been tossed away. With respect to the religious discrimination claim, the Court is granting summary judgment based on a failure of proof in the record, not because Dantzler has pressed forward with frivolous claims. Dantzler's position seems to be that Hollinger—a non-Muslim—should have been terminated earlier because she was a problem employee who had engaged in bad behavior that ACTS overlooked. Dantzler, on the other hand, was an outstanding employee, who was fired at the first possible opportunity. Based on the record before the Court, this theory lacks a factual basis that could go to a jury. But ACTS's call for sanctions amounts to a wholly unwarranted escalation. Finally, the Court will not award sanctions based on Dantzler's religious accommodation claim. The testimony was not as crystal clear as ACTS believes on the issue of Plaintiff bringing up the topic of prayer at work. First, she had been praying in her car at work for years. Second, her testimony was that she told Levesque, "I'm going to my car to pray." (Dantzler Dep. at 83.) Thus, the Court disagrees with the statement in ACTS's sanctions brief that Dantzler "admittedly has no evidence that her employer was even aware that she prayed during her breaks."

Dantzler's theory of the case was that going to her car to pray only became an issue when Levesque came on board. Ultimately, it seems as though a conflict was avoided as the record reveals no evidence that Dantzler refused to clock out prior to going to her car to pray. But the Court explicitly relied on the third prong of the religious accommodation test because the law clearly foreclosed the claim based on Dantzler's own words and actions. This is a case in which ACTS was legally entitled to fire Dantzler. It is not a case for sanctions.

## IV. CONCLUSION

Dantzler has failed to make out a claim for religious or age discrimination. The Court therefore grants ACTS's motion for summary judgment. ACTS's request for sanctions, however, is denied. An Order consistent with this Memorandum will be docketed separately.